District Court. Ms. Ruloph's claim was laid under the provision of 42 U.S.C. section 1395 double small d, the Emergency Medical Treatment and Active Labor Act, which understandably is commonly referred to as EMTALA. In the EMTALA, by enacting that statute, Congress created certain duties imposed on hospitals that participate in the Medicare program, most of which duties were unknown to common law. Specifically, the Congress substantially restricted the ability or power of hospitals to transfer patients to other facilities. Now, this is, this case comes up under a statute, and the rules of statutory interpretation, I think, are fairly well followed and uniformly, and the first thing is you look at the language of the statute. If the language of the statute is of plain meaning, giving the words their ordinary sense, and then that stops where then the construction and interpretation process starts, and then we go to the applying the statute to the facts. My submission to the court today is that provisions of EMTALA that are an issue here are very, of very plain meaning, and that should be applied to the facts in accordance with the language of the statute, and so, but that did not happen in this case. Well, Council, what is it, Council, what is it that you cite to us from the statute that was not followed and misinterpreted by the district court? The, the, this Mrs. Rudolph was transferred from the hospital in Fort Smith, Arkansas, Mercy Hospital, to Washington Regional Medical Center in Fayetteville. It is our contention that that transfer was not appropriate under the plain language of the statute because Washington Regional was unable to treat her condition even though it had accepted her transfer, and by definition, it was an improper transfer. The defense is that they did not know that Washington Regional could not treat Mrs. Rudolph, in fact, had been assured by state agency that Washington Regional was appropriately staffed to treat the agency, and therefore, they say that their lack of actual knowledge of the mistake obviates the violation of the EMTALA Act. Well, Council, looking at our Summers case, which was an in-bank decision of our court interpreting the operation of EMTALA, looking at its origin and, and purposes to address the problem of what was then described, and I guess sometimes now described as patient dumping, that put in place certain processes for patient transfer. It, it seems that that case in, in telling us what EMTALA is about clearly tells us that the statute wasn't designed to put in a tort law for malpractice, and that in a scenario where the hospital personnel medically performs their obligation, that EMTALA doesn't create a cause of action for not providing certain medical services, and I'm, what I'm trying to figure out in this case is, what was it that was supposed to have been done under the statute that was not done, because the statute seems to contemplate an initial screening by hospital personnel, and based on that screening, a, a transfer or the organization of a to treat, and so in this case, it turned out the, there were just things that the hospital didn't know. The receiving hospital made representations that, that turned out not to be accurate, and it, it seems that there are medical decisions taking place and not decisions that seem to be the focus of the purpose of EMTALA. So, focus me in on what, rather than just broadly a transfer, what, what was it that didn't comply with EMTALA, and, and, and why the district court's interpretation of EMTALA is, is erroneous. Your Honor, the, the, so if I might start with your Honor started with, Summers' case was addressed to two requirements of EMTALA. The first requirement is that a, a patient be given an appropriate evaluation if they appear in emergency room to determine whether they have an emergency medical condition. Did that happen in this case? Yes. You know, we make no complaint at all about the, the evaluation that hospital, Mercy Hospital, in fact, determined that this lady had an emergency medical condition, and that determination triggered an alternative duty on the part of the hospital. The hospital could treat her within its capabilities, or it could order a trans, it could provide for a transfer provided that the transfer met the requirements of subsection C2 of EMTALA Act, and when we look at, go to subsection C2, we see that a, an appropriate transfer has been defined by Congress as including three things, primarily, one of which is that the receiving hospital, in fact, be staffed to treat the emergency medical condition. That didn't happen in this case. The transfer did not comply with EMTALA because of the inability of Washington Regional to treat this lady's condition. The defendant says, we didn't know that they couldn't treat her, and therefore, we're off the hook. My position, my submission to the court is that EMTALA, by its plain language, does not provide a safe harbor if the transferring hospital is false information. It is, we believe the statute implies, and not only implies, requires a strict liability sort of analysis, and if that applies, the knowledge of the transferring hospital is irrelevant, just as though... Has there been a case that has held that with facts like this case? Not to my knowledge, Your Honor. My research is not unearthed if it exists. Mr. Blair, why wouldn't... Go ahead, go ahead. No, no, you should go ahead. Go ahead. Under Summers, it focused, as Chief Judge Smith said, not on a malpractice approach or a tort approach, but whether there was uniform or non-uniform treatment, was the person treated as anyone else would have been who came through and really focused on the procedure? Why don't we apply that same approach here to determine whether or not the hospital followed the proper procedure as they would with anyone at the time they were requesting the transfer? Your Honor, we think the hospital did follow the appropriate procedure. It turns out that the procedure in this case did not comply with EMTALA. The Summers case involved both the question of the adequacy of the evaluation of the person that came to the hospital, and the court held that that was a medical matter, it's not a legal matter to determine whether the evaluation is appropriate. It also addressed the requirement to treat, and that requirement only arises if the evaluation shows that there is an emergency medical condition. If the initial evaluation does not reveal an emergency medical condition, then EMTALA no longer applies. It's out the window. If it does determine that there is an emergency medical condition and certain issues are triggered, the issue in Summers is whether the determination is a subjective or an objective factor. That is, is it actual knowledge, or is it should have been knowledge, and the courts have held pretty uniformly that the word determination connotes a subjective state of mind, and therefore, whether or not there was a determination is essentially a matter that comes back to medical matter, like the evaluation of a condition is to determine whether it's an emergency. But we're past that in this case. There's no complaint about any of the process, except the transfer was to a place that couldn't treat her with rather dire circumstances. I'm into my reserve time, your honor. If I might yield the floor, I will do so. I don't see any additional questions. Thank you, Mr. Blair. Thank you, your honor. Mr. Martz. Good morning, your honor. May it please the court. I'm Gary Martz. I am arguing today on behalf of all the Appalese, but I represent Mercy Hospital, Fort Smith and Mercy Clinic, Fort Smith communities in this matter. I think the problem with Mr. Blair's argument, both in his briefing and here today before the court, is that he's trying to make it clear that there is a medical condition the interpretation that he urges the court to adopt of the appropriate transfer provision of Intala would create a jarring disconnect between Summers and how it applies Intala and how it would be applied in this. Well, counsel, counsel. Yes, sir. Summers says that the statute is a strict liability provision. And of course, that's what the Tenth Circuit says. That's what many other courts have said. And if you look at the structure of the statute, it has negligence all over other sections. But in this, it only has the word appropriate, defines appropriate. And so, gosh, it looks like Congress meant for strict liability. Well, I think if Congress had meant for strict liability, they would have said strict liability in the statute. Counsel, counsel, negligently is in five other places here on the same page, ahead of it, behind it. They know how to say negligently. They didn't say negligently. They said appropriate. The standard is not even negligence, really, or strict liability. The standard is appropriate. And then they define appropriate. And so, they can change the law that applies in the standard, whether it's negligence or strict liability. And their standard is appropriate. They made it up with their Congress. Go ahead. I respectfully disagree with that reading of the statute, your honor. The civil enforcement provision at subsection D2 refers to, and you're right, other sections do refer to negligence. That refers to a violation of a requirement of the statute. And so, the question is, what is a violation? And what Summers did, Summers doesn't say that it's strict liability in the sense that Mr. Blair is urging. The phrase strict liability, as it's used in Summers, is cabined with a qualifier, in this sense. And what it means is a failure to perform one of the acts that is required by MTALA. It's not a requirement that you are liable if you do it poorly or if you make a mistake in that process. What it is is liability if you fail to perform a screening in that context. So, what happens in Summers is the plaintiff in that case gets injured in a deer hunting accident. He comes into the hospital. He's got a bunch of complaints. He says he complained of chest pain. He said his breathing had a popping noise. The attending physician at the emergency room takes x-rays of his spine, but doesn't take x-rays of the front side, doesn't get an x-ray of the sternum or the ribs. And so, he goes home. He has to be admitted to the hospital. They declined because they didn't think it was sufficient. They just thought that he had been banged up a little bit. He goes home for a couple days, suffers, goes back to another doctor, and finds out when he's x-rayed on the broken ribs, a broken sternum, and he also finds out from a CT scan that was done at that time that he had a broken vertebrae. He sues and he alleges that the hospital violated EMTALA because it should have, based upon what the doctor knew, ordered a chest x-ray. And what the court said in the opinion in rejecting that claim was that EMTALA doesn't impose a standard where the courts are going to come in under federal law and examine the quality of the care that is provided by hospital. They're only interested that the hospital is not doing something that equates to dumping patients. That's the focus of the statute. The focus is on dumping. Congress didn't want hospitals having patients come into the emergency room and hospitals to say, this guy's uninsured, or he looks like he doesn't have enough money, and then send him on his way. They require to prevent that a screening, stabilization if possible, and an appropriate transfer to a facility that can treat that person if necessary. Counsel, you missed the requirement. The hospital may not transfer. That's what dumping is all about. I'm quoting the statute to you. The hospital may not transfer the individual unless it's appropriate as defined in the statute. So you can't do anything unless there's an appropriate transfer. Well, I'm going to get to that. But you'll get to it pretty quickly because to me, you know, the Tenth Circuit cases and candidly are most of our approach in Summers. But get to it however you need to. Well, there are two others here. So what I wanted to say is that eventually arrives at a point where the court says, look, EMTALA leaves the question of whether a hospital provided a certain quality of care to the states. That's the area of state medical malpractice law. What we're interested in is do you comply with the provisions of the statute? So in Summers, there's no liability, even though there might have been an allegation that the hospital didn't do everything it could have done or should have done. But it's not a violation of EMTALA because EMTALA is not concerned with that. EMTALA is concerned with whether you perform the procedures that are required under EMTALA. So applying that particular standard to the appropriate transfer provision in EMTALA requires that provision is at 42 U.S.C. 1395 D.D. subsection C-2. And what it requires is the receiving facility have available space, qualified personnel to provide needed treatment, and has agreed to accept the transfer. There's absolutely no dispute in this case that all of those things happened here. The Mercy Hospital... I'm going to interrupt you again. When do you measure that? That is the key to this case. You measure that when a patient goes out the door? Go ahead. You measured at the time that they performed those tasks that EMTALA requires them to perform. And it required them, once they figured out, because what happens here is, and there's no dispute as to the facts, that Ms. Ruloff had a vascular injury to her leg that Mercy Hospital could not treat. They did not have a surgeon available who could do that. So they call the Arkansas Trauma Communication Center. Trauma Communication Center connects them to Washington Regional. There is a conversation between doctors, and the doctor at Washington Regional says, we can handle this. We accept the transfer. And that's the point at which this is measured. Did that hospital have available space? Yes, it did. So you think you measure that as they go out the door? Yes, sir. I think you absolutely have to, because again... Wait, wait, wait, wait. Often they're going out the door on a helicopter, or an ambulance, or something like that, that's even owned by the hospital. And you say even if they're still under the hospital's control? Well, yes, your honor, because the decision is made to transfer based upon the information that's provided by the receiving hospital. And that information here provided that... Knowledge, information from the receiving hospital is not in the statute, right? Well, it's not specifically in the statute, but it must be because the statute requires that the receiving facility have available space and qualified personnel. And I don't think there's any other place to get that information other than from the receiving facility. Counsel, it could be an affiliated hospital. There are four or five big hospital corporations that own a tremendous percent of the hospitals in this country. So it could be another hospital that they really know about. Go ahead. Yeah, sure, there could be. But in this instance, in this case, the actual knowledge that they had was that the hospital represented to them that it had space and it had qualified personnel. And it wasn't until Ms. Ruloff was dispatched by ambulance, and she's somewhere between Fort Smith and Fayetteville, that a surgeon at Washington Regional in Fayetteville looks at the available information and thinks this may be a little more complicated than what we can handle. Does the record reflect... I've got to interrupt you. Does the record reflect whose hospital, I mean, whose ambulance it was? I don't remember if that's in the record or not, Your Honor, as to who owned the ambulance. Was it Mercy's? Was it Mercy's or any of the defendant's ambulance? I don't believe that it was, Your Honor. I'm not positive on that in terms of a cite to the record, but I do not believe it was their ambulance. Thank you. But this is Jed Smith. Let's assume that, and I don't know precisely at what point in the transfer the 70-odd miles between Fort Smith and Washington Regional, that notice came that Washington Regional was not really prepared. Apparently the transfer proceeded to Washington Regional and then later determined to move her on up to southwest Missouri to another hospital. Does the record include the time frame in terms of the time that Mercy got noticed that the transfer to Regional was not going to provide the treatment that the patient required? And was there an opportunity in there for Mercy to make alternate arrangements before there was what amounted to ineffective time at Regional before moving on to the third hospital? I'm not positive exactly of the time frame in which it was learned while she was en route. I do know that the record shows that that was once it was determined that Washington Regional could not treat, that the most appropriate and nearest hospital that could treat was the hospital located in Springfield. And so that was why she was sent to that to Springfield. I don't believe that there's anything in the record that suggests that had it been determined earlier that there is. Was it a matter of record as to the additional time involved where there's this very serious lack of oxygen to her lower leg that's attributable to the ineffective initial transfer to Fayetteville? Yes. I mean, the time frame in terms of what the record establishes is a little bit unclear to me. But I think that, I mean, the net result was that by the time she made it to Springfield, she was out of the window to have the treatment. Right. That's undisputed. That's clear from the briefing. But what I'm trying to figure out is how long was she in Fayetteville before moving on up to the other hospital? And is there anything discussing if that transfer had continued initially? Once it's discovered Washington Regional can't be the second treating hospital, what additional delay was built in before the transfer on to the third hospital? I am not positive how much delay was attributed to that, your honor. I just, I don't have that in front of me. My sense is that she was at Washington Regional a very short time and then was immediately sent on to the hospital in Springfield. I don't believe that there was much delay in that regard. But what I'd like to say Was Mercy notified immediately when Washington Regional couldn't, is that the communication that took place when Washington Regional determined we can't handle it? Was it Mercy they called and informed them at that point, we can't handle this? I believe it was, I think that was communicated to Mercy, but it was Washington Regional. Washington Regional then handled the transfer to the other hospital. And so that was the, that fell on Washington Regional as having accepted the transfer for them to then go ahead and transfer to another hospital. But what I would like, the issue I'd like you to focus on is when we measure this duty. There's a duty, I know you say negligence or knowing. Do we measure it as the patient leaves? If you look at subsection capital D it says the I think that means the transfer doesn't end until qualified personnel and transportation equipment get to the next hospital. Do you think the transfer process lasts to the next hospital? I think the transfer process ends, your honor, when they affect the transfer, which means that the patient has left the control of Mercy, is on an ambulance, and is on the way to the receiving facility. That is the only point at which Mercy could have done anything in this case. They had the information. If you have the statute, do you have the statute handy, the affected? I don't have the entire statute. Okay, anyhow, well, I'm beginning to think that maybe the word affected has to mean something here, and I'll try to figure out what it is. But you say it's affected when they leave the hospital. Well, I think it's a matter of principle. I mean, this is not the decision to transfer a patient to a different facility is not something that is just done cavalierly. This was a process. That's what Congress was worried about. Well, that's right. This is a process that took some time, and you can see the way that the process worked in that there was a communication with the Trauma Communication Center. There was a connection to Washington Regional. There were conversations between the hospitals about the qualified personnel. It's at that point when that information is in hand, and they send the patient on their way to the next hospital that the transfer has been made. And that has to be the standard, because otherwise they're being made liable for something that may be nothing more than a mistake or just miscommunication from the other hospital, which is not what MTALA looks at. MTALA looks at whether you followed the procedure, and they followed the procedure. My time's up. Thank you, Mr. Martz. I don't see any additional questions. Thank you, Mr. Martz. Thank you. Mr. Blair, your rebuttal. Mary, please, the court. Judge Smith, if I could go to your question about the timeline, the inability of Fayetteville, Washington Regional to treat this lady was discovered when she was about halfway into the ambulance, ground ambulance ride to Washington Regional. There was a three-way conversation between Mercy, Washington Regional, and the Trauma Control Center about what do we do? We've got this woman on her way to Fayetteville. Fayetteville can't treat her, and the decision was made to send her to Mercy Springfield, which was staffed to appropriately treat her. But when she got to Fayetteville, rather than immediately putting her on a helicopter, they took her in and did the emergency room workup, and all of that, the delay of the trip to Fayetteville and the emergency room workup before she was on her way to Springfield cost her just under two hours of time in time to recover from this. Summers did not get to this issue. Summers did not get past the failure to determine that there was, in fact, a medical emergency, and the argument in Summers, well, was that they should have determined that. They had adequate information to determine that, and the court said, well, it's actual knowledge. Determination means actual knowledge. Determination is a subjective term. They never got past that. Entaliduties were not ever invoked in Summers because that crucial determination to determine that there was a medical emergency was not ever invoked in Summers, and they never got past that. I think it's implicit in the statute when they say effect the transfer. I don't think it matters whose ambulance it was. As a matter of fact, I think this was an independent ambulance in Fort Smith that took her up rather than a hospital-based ambulance, but I'm not 100 percent sure of that. But what it comes down to, they sent her to a facility, perhaps with an empty head and with the requirements of EMTALA, and therefore, there was not an EMTALA-compliant transfer. The statute clearly says that a hospital must not transfer a patient unless these requirements of subsection C of the statute are met. Those requirements include the fact that the receiving facility is, in fact, staffed to treat the emergency condition. But surely that can't be 20 days later that they determine that, counsel, right? Surely you can't make her an inpatient, and 20 days later, they find out then, oh, we don't have the facilities to do it, right? That's right. So when does the duty end? When does the duty end? The duty ends when she gets to an appropriate facility, and in this case, that duty ended when she got Springfield Mercy. Your Honor, it looks like I have exhausted my time and the Court's patience, and if there are no questions, I will yield the floor again. All right. Thank you, Mr. Blair. Thank you also, Mr. Marks. The Court appreciates both counsel's participation and argument this morning, and we will take the case under advisement. Counsel may be excused. Thank you.